morning is Gifford Pinchot v. The Fish and Wildlife Service. Stephanie Parent Good morning, Your Honors. My name is Stephanie Parent, and I represent the appellants, the Gifford Pinchot Task Force and others. I'd like to reserve two minutes of my time for rebuttal. At issue this morning are six biological opinions where the Fish and Wildlife Service has authorized over 64,000 acres be timber harvested that are at the same spot at Owl's habitat. That includes over 21,000 acres of habitat that Fish and Wildlife Service itself deemed is critical to this species' ultimate recovery. The Fish and Wildlife Service issued these biological opinions while relying upon a long-term plan's predictions and assumptions and not relying upon the short-term information that it stated was critical to be able to determine the effects of this timber harvesting on the owl itself. In addition, the Fish and Wildlife Service has allowed the complete removal and degradation of the owl's critical habitat, and in so doing, it concluded that this would not result in an adverse modification of that critical habitat. These biological opinions do not meet the Fish and Wildlife Service's dual and distinct duties under the Endangered Species Act. I'm going to first discuss the agency's jeopardy duty. In the course of doing that, I would appreciate it if you'd give some detail in your argument to explain the significance of the forest plan, the Northwest Forest Plan, because it seems like it's, if not like a 600-pound gorilla in the living room, it's standing there. And the question I have is, how much weight does it have to be given? And I realized that it said there would be another, when they did the opinion on that, they said, well, there'll be specific opinions on different cuts or harvests, but still, it seems like its basic plan has a lot of weight. So if you could address that, I'd appreciate it. Yes, Your Honor. The Northwest Forest Plan, here the Fish and Wildlife Service did say in its programmatic biological opinion that it was concerned about the unprecedented nature of the Northwest Forest Plan, because it's a long-term plan. It's supposed to be carried out over the next 50 to 100 years to conserve the spotted owl. Due to the uncertainties in such a long-term plan, what Fish and Wildlife Service said in the programmatic biological opinion, that it would be critical within the first five to ten years to be doing the monitoring that it was going to need to rely upon in order to be able to determine the effects of the timber harvesting on the owl in those site-specific biological opinions. What the Fish and Wildlife Service has said here is that this court should follow the series of cases in the Pacific Coast Federation of Fisheries Associations, or also known as the PCFFA cases. In that case, there are two very important distinctions in why the Fish and Wildlife Service in this case cannot rely upon only consistency with Northwest Forest Plan timber harvesting provisions. First, in that case, the National Marine Fisheries Service's programmatic biological opinion on the aquatic conservation strategy portion of the Northwest Forest Plan explicitly set consistency with the ACS as the standard that it was going to use in future site-specific consultations. Secondly, the reason why this works for the aquatic conservation strategy is that if a project is consistent with the ACS provisions, that means that that project will maintain or restore the aquatic habitat that the listed species, Selmatids in this case, are relying upon for their existence and long-term recovery. Maybe I heard it a little differently when I read the briefs, but I thought that the argument is not that it's simply consistent, which I think at a minimum it would need to be consistent, certainly with the Forest Plan, but that in addition, the site-specific additional analysis that is undertaken is what the BIOPS did, and that they weren't simply relying on the Northwest Forest Plan. Would you respond to that? Yes, Your Honor. What happened in the site-specific biological opinions is that they didn't rely upon the monitoring information, what they did is they looked at, excuse me, the proposed action is to allow timber harvesting of a certain number of acres of the owl's habitat. In one case, in the Willamette province, they allow over 29,000 acres of the habitat to be timber harvested. In making the biological opinion jeopardy determinations, the agency didn't ever analyze what the effects of that timber harvesting would be on the species. It simply said that that species would lose that amount of habitat. And that's contrary to what the numerous places in the record where the Fish and Wildlife Service and other federal agencies said it would be necessary to continue to rely upon population counts and population monitoring in order to be able to determine the effects. Right now, the Northwest Forest Plan is simply a set of predictions based on assumptions. Those places in the record are, first, the Northwest Forest Plan Programmatic Biological Opinion at ER 273. In the federal agency's Effectiveness Monitoring Act, which is a set of predictions based on assumptions based on assumptions based on a population monitoring plan, where they're eventually going to determine whether or not this plan and the predictions in the plan are effective for providing for the owls, the agency said at SER 305 Note 1 and at 309 to 310 that the long-term population studies, known as the metapopulation studies that they're conducting right now, aren't useful to the consultations that are occurring in the short term, and that, in fact, the agency was going to need to use other tools, including validated habitat models, to allow them to determine at the landscape level what the effects are on the species in using habitat. But they're not there yet. Right now, they need to continue the population-based monitoring. Moreover, in the Fish and Wildlife Service's so-called range-wide update, which they prepared in the course of this litigation, at Excerptive Record 351 to 352, the agency discusses the usefulness of the population data, and it states that there is a range-wide update and that there's existing data that it simply hasn't analyzed to determine what effect the land-use allocations are having upon the species itself. And it stated that they need to analyze this existing data, and it may provide an estimate of whether the current late successional reserves, where the areas are set aside, status is as expected, or if other mechanisms, such as surveys, may be needed in order to determine, in the short term, what the effects of this current timber harvesting is having on the owl. And finally, on that point, I mean, that's a threshold issue we have to get over, and that is the proxy arrangement. It seems like we're kind of between a rock and a hard place with the analysis on this, in that you need a longer term to figure out more than one population count. We're not there yet. In five years, I'm sure you'll all be back again on a related issue. But I'm just a little hard pressed, I should tell you, and maybe you can point me in the right direction, to second-guess the habitat proxy, albeit, you know, objectively, in an ideal world, I can see where, you know, a one-by-one population count would be perfect. They've brought up a lot of issues as to why that's not appropriate here. Why shouldn't we, at least on this point, give some deference to the method, and then figure out if there was some use? Yes, your Honor, there are a number of reasons why Fish and Wildlife Service is not entitled to deference, in this case, to rely upon a habitat proxy. The first is all the record sites that I just gave you, where they say surveys are necessary in order to do the work. The second is all the record sites that I just gave you, where they say surveys are necessary in order to do the work. The third is  they say, and in particular, the Fish and Wildlife Service studiously ignores its consultation handbook, which is the most detailed explanation of what the agency itself believes its duties are in making its jeopardy determination. In the handbook at page 429, 4-29, which is in the addendum to appellant's brief, the agency says that to determine the effects on the action, it needs to look at the species response, including the numbers of individuals slash populations in the action area, and the, quote, age, sex, breeding status, and distribution of affected individuals, unquote. The agency simply can't make that type of determination by looking at only the number of acres of habitat that it's being allowed to be destroyed. There's a specific methodology and backup in the BIOS that substantiate that looking at the habitat will produce that result. In other words, you either say, I'm going to grab every island and count them one by one, or science, if you will, I'll use that term generally, will say that I can produce that result, and I think that's the proxy theory, by doing this. Now, what's in the BIOS, or what's lacking in the BIOS to support that, if I'm correct in that in their argument? I think that's what they're arguing. Yes, Your Honor. I would submit that there isn't that analysis in the BIOS explaining why the habitat is an adequate proxy here, and the other citations to the administrative record demonstrate that, in fact, the agency employees themselves don't believe that this is currently an adequate proxy. The biological opinions themselves simply list out how many acres of each type of habitat they're going to have, and then review them again. I will not find the science to support a proxy approach. I don't believe you will, Your Honor. I don't believe it's in there. Let me ask the next question, because I've been here too long on spotted owls. We started out in the spotted owl world by trying to verify the gross picture, that is, the forest plan. The forest plan always said, in a prior opinion, said, when we get down to cutting in a specific area, we'll take care of the details you're arguing about or concerned about in the gross plan, and that's where we are today. And your argument is, well, what you're doing is you're not taking care of it. You're bouncing it back. So it's sort of a circular argument. So if I look at the BIOS and don't find the science to support proxy, then that would support your position that you either count individually, or you better have something else that shows that the proxy is valid, and you're saying it's not there. That's correct, Your Honor. In fact, what you'll find in three of the biological opinions, the ones that are on the Gifford-Pinchot National Forest, are that the agency, in its conservation recommendations, actually recommends that the action agency undertake surveys in order to validate the habitat model. So in their briefs, and of course their litigation positions aren't entitled to any deference, in their briefs they say why this is happening, but the record demonstrates something else. And so where they're recommending surveys in order to validate a habitat model that they are somehow relying upon in making those very same biological opinions, that sort of analysis isn't entitled to any deference. This could be like, you know, it's like a belt and suspenders. They think the science supports a habitat proxy, but they recommend there be surveys to verify. That's possible, but I do believe a review of the biological opinions will show that it's simply an accounting of habitat acres and there's no explanation, in particular the effect of this monitoring. Can I stop you just there a second? Because I understand the issue, but I'm really confused about where we fit in the process, especially on deference and about the science and whether or not we're going to become scientists or try to determine whether they did it right. Are you trying to tell us that if we look deep enough into this, that we're going to find that habitat will never support the study? In other words, habitat and owls live together, of course, but by studying habitat, you're never going to come up to the duty they have under Jeopardy to determine the number of owls and what's being affected by the process. Right. That is not Appellant's position. Appellant's position is that currently at this short-term phase of the implementation of Northwest Forest Plan, the agencies themselves have admitted that they don't have sufficient information and they don't have validated habitat models in order to be able to rely upon habitat alone. No, I read that. So again, if we look at the biops, we will not show that the science is sufficiently developed to use the habitat model. Maybe later, but not now. The biological opinions themselves, the Northwest Forest Plan effectiveness monitoring plan also talks at length about the difference between looking at populations and looking at habitat and explains that it believes the population-based monitoring in the short-term is necessary to be able to determine the effects until some point when they have developed their validated habitat model. I don't want your time to get away without talking about habitat. So if you don't mind moving to the critical habitat issue. I will just say, and nothing is fixed, but the regulatory scheme that they've adopted would appear at least on its face to have conflated or improperly interpreted the statute along the lines of the Fifth Circuit. Just assume we accept your position on that. Then the next question is, but maybe it didn't matter because maybe they have the regulation, but they still did the whole analysis properly so that you could uphold it under the statute. Would you speak to the second prong, please? I would say that even if you follow the Fifth Circuit, it doesn't matter because they didn't do the analysis that's required by their regulation. The Fish and Wildlife Service's regulation at 50 CFR 402.02 defines what is destruction or adverse modification of critical habitat. It's defined as an alteration that appreciably diminishes the value of that critical habitat. And it goes on to explain that such an alteration includes alterations that adversely modify those physical, biological, biological, biological, biological, biological features, excuse me, those physical or biological features that were the basis for determining this habitat to be critical in the first instance. And so we really need to look at the facts of this case and what kind of habitat we Before you do that, just while we focus on the regulation 402.02. Yes, Your Honor. It says destruction or adverse modification means an alteration, direct or indirect, that appreciably diminishes the value of critical habitat. But then it says for both the survival and recovery of a species. And it seems that that's a problem for the government here in the sense that it would make more sense since Section 7.1 of the Fish and Wildlife Service would require that the government protect both the species' continued existence and habitat that might permit it to recover. Shouldn't this regulation say that appreciably diminishes the value of habitat either, habitat for either that affects the survival or the recovery of a species? Absolutely, Your Honor. And appellants have argued that this Court should follow the Fifth Circuit in the Sierra Club case in saying that that regulation is facially invalid. Okay. So then you get to, it seems that the regulation, at least I can't, I'll hear the government side of it, but I can't right now understand how the regulation can be squared with the statute. The statute protects not just, not just a threatened species' continued existence, but also that it protects the habitat so the species can get a recovery, hopefully. I agree 100 percent, Your Honor. So it's not enough to say, well, we only destroyed enough habitat. The habitat we destroyed isn't going to kill the species. They can't destroy, they have to consider if it also affects recovery. Absolutely. But then what if they did all that, as Judge McEwen asked? What if the regulation's wrong, but they did assess habitat in both respects? You have a good command of the record, and so maybe you can point us to where, in your view, they weren't doing these independently. If you look at the biological opinions, and I'm sorry I don't have those record sites at hand, but when they make the critical habitat units, and in so doing, they don't make a lot of distinction between survival and recovery, so I imagine they'll argue that they've made the distinction. However, if you look at what they've actually done, they haven't complied with what an adverse modification means under their own regulations. What they said is, we can allow this to happen because it's only 1 percent or 0.4 percent when you bring everything up to the landscape scale, and secondly, we can do it because we have late successional reserves. Now, of course, you know, those don't completely overlap the critical habitat units. What they needed to do is look at whether or not the timber harvesting occurring is adversely, or altering and adversely modifying those physical or biological features that were the reason for that habitat being designated critical in the first instance. And just to try to counterpoint their argument so I can hear what you have to say, I think they would interpret the argument you're making as, well, you can't bring down, and therefore you can't just, if it's a small percentage, you know, it may well, in fact, not be an adverse effect that's a modification of the critical habitat. So what do we, what do you respond to that? I'd like to point you to an example of just one of the biological opinions and get some real facts on this so that we can see why this is an adverse modification. In the Willamette Province biological opinion, the agency at page ER67, the agency allows a timber harvester to do timber harvesting of over 13,000 acres of critical habitat. Over 4,000 acres of those critical habitat acres will be completely removed. At ER page 72, the agency defines removed as to eliminate the functionality of either suitable or dispersal habitat. They allow an additional 4,000 acres, excuse me, that's removed or downgraded, over 4,000. They allow an additional 4,000 acres of each suitable and then another 4,000 of dispersal to be downgraded, which means, is defined as to affect the quality of this habitat. That's as far as they get. They never look at whether or not that's affecting the physical and biological features, which in the 1992 rule designating the critical habitat for nesting, roosting, foresting habitat, those features are high canopy closure of 60 to 80 percent, multi-storied layers of trees and vegetation, and in the overstory, the trees need to be large trees greater than 30 inches in diameter. We're getting down to science now. You're just saying that they omitted to analyze the science or the science is wrong or the science is not there, because whether you remove one tree or 500 or 4,000 acres means nothing to me. I mean, it means something to me, but scientifically or with regard to the law, what's required, I don't know what it means. So are you saying it's missing or wrongly analyzed or not analyzed at all? I'm saying that it's missing. The relevant factors in its own definition, they simply have failed to analyze those relevant factors in this situation. They've just looked at acres. And as to its two reasons, first of all, the percentage, relying upon a percentage at a landscape scale, the agency has stated that it has to look at the local scale and at the landscape scale. This court in the PCFFA decision said you can't look at the landscape scale only and ignore the degradation that's occurring at the site-specific level. When it looked at the local level in many of these biological opinions, Fish and Wildlife Service expressed some grave concern about critically habitat units that were being harvested in areas of concern, mostly in the I-5 corridor, which is necessary for these species to be able to, the populations to be able to intermingle and mix their genetics for their long-term survival. As to the LSRs, the Supreme Court in TVAB Hill said destruction and adverse modification is an absolute ban. In that case, they were going to move the snail garter to suitable habitat, and the Supreme Court said it doesn't matter if you do that. You're not allowed to destroy habitat. So the fact that you may have a nearby LSR does not allow the agency to allow for the destruction of habitat. Okay, now, do the biological opinions on the, I guess there's six specifically teed up in this litigation, do they, when they talk about modification of habitat, do they talk in terms of recovery of the species specifically, or do they talk in terms of continued existence of the species, or do they talk in terms of neither? My recollection, Your Honor, is that they don't really talk in terms of either. It's honestly about a paragraph in each biological opinion where they say this many acres will be affected, that will have an adverse effect, but then conclude that it does not arise to destruction or adverse modification. They mention the small percentage, they talk about the LSRs, and they're simply, my recollection is that they don't really talk in terms of either. If the regulation is off base for the reasons that the, it's the Fifth Circuit, I guess, said, I mean, just because it can't really literally be squared with the statute, then is there any law about presumptions of regularity of agencies? I mean, would we presume that they're following their regulation unless the record shows us something different? I don't imagine they specifically defied the regulation, which requires them to look at survival and recovery. I simply don't have anywhere to point you in the record. They just don't. I mean, normally would you see a discussion of survival and then a separate discussion of recovery so that we would know that such a distinction had been made? If they did make that distinction, for these reasons the survival will not be affected, for these reasons the recovery will not be affected. What if they don't use either word? Because I'm looking at this particular one. I guess it's number five. I don't see either word used in their discussion of the critical habitat. Right. And that was my recollection as well. And I think that the position, it's a bit of an awkward argument for me to make that they're presumed to act regularly because the rest of my argument is that they have not. But since they don't discuss it, I think we do have to assume that they're acting pursuant to their regulation, which we believe is facially invalid under the Endangered Species Act. Are you saying that survival analysis could never be recovery analysis? No. I'm having the same trouble. I'm going to have to go back and dig through that stuff. But if they don't separately analyze this, we can't like on a de novo review say, well, it looks like survival, but it's really recovery or... I understand. I think if they don't separately analyze it, that's a problem as well. I think there's a very good place in the record in the 1992 final rule where the agency designated critical habitat. They have a very nice discussion that we've cited in our briefs where they talk about the differences between survival and recovery and why these are completely different standards. So back then, the agency was adhering to the spirit of the Endangered Species Act. Now, I think that they've sort of melded those two duties. Let's say this isn't the case, but just to make it simple, let's say there were four spotted owls in the area. There were four spotted owls in the world, and there was enough habitat for four spotted owls unless it was appreciably diminished. One could kind of get their arms around mentally that if you knock out more of the habitat, those four aren't going to make it. So you need to keep what you've got for those four. But if you ask yourself, how much more habitat do you need so that instead of four, there'll be 40,000, then it's a different, you obviously need more habitat. Is there anything in the law or in the record that tells us how much habitat would be needed for recovery of the spotted owl to the government's list? What we have in the record is the 1992 final rule designating the critical habitat. And the definition of critical habitat is supposed to be all of that habitat that is necessary for the agency's eventual recovery. But if you look at the rule, we're already operating at what the agency itself found is necessary. We're already operating at a deficit of critical habitat. In that rule, the agency determined that, I don't recall what the number off the top of my head, but somewhere over 8 million acres was required in order to provide for the recovery of the spotted owl. And then the ESA allows it to do an economic analysis. The Fish and Wildlife Service eliminated 865,000 acres that it thought was critical to the species recovery, but it eliminated because it was on state and private lands and that was going to have too great of an economic impact. So the critical habitat we have is already something less than what the agency thought was necessary for recovery. All right. Let's hear from the government. Thank you, Your Honor. Good morning, Your Honors. I'm Justin Smith for the United States. Also here today is Mr. Walsh for the intervenors, who will be speaking after me. I'd like to reserve four minutes for him. But I'll just proceed. You know the issues. I do, yes. The opinions are, as Your Honors have been observing, all issued under the framework of the Northwest Forest Plan, which is a very comprehensive plan based on state-of-the-art scientific knowledge, and which does incorporate a very comprehensive monitoring program. The plan has been reviewed by this court before. It was upheld in Seattle Audubon. And we would like to hear from you about the findings. I would submit that many of the arguments the plaintiffs are making are an effort either to revisit issues decided in Seattle Audubon, or to second-guess basically scientific determinations that have been thoroughly and comprehensively made by the United States. Okay. Why don't we get down to the real issue then. And that is, the first one is habitat proxy. And accepting, of course, that the forest plan is a model for doing this. But that subsequent to the forest plan we're supposed to have individual determinations and some short-term effects analysis. The service has taken the habitat proxy as its model for doing this. So it would be helpful for me to hear from you, given the various statements in the records that suggest population-specific should be employed in the consultation manual and various references you've seen in the briefs, what is the scientific basis and where do we best look if we were to try to make a judgment as to whether to defer on the habitat proxy? I think the first point is that it's not just a habitat analysis. If you look at the biological opinions, they go into a lot of detail about the specifics of these actions. And there's even more in the biological assessments, only one of which we've put in the manual. The LAMIT opinion talks about five or six areas of dispersal concern and analyzes those quite carefully to make sure that the owl can migrate properly. There's a lot of demographic study work being done on the owl. Thousands of owls are being banded in these long studies in, I think, 13 study areas around the range of the owl. And that data is incorporated into the biological opinions. The habitat proxy is one feature of this analysis, and we think it's pretty well validated. The owl is probably one of the best-studied threatened or endangered species, and its behavior is increasingly well understood. The LENT report, which is the Effectiveness Monitoring Report that the plaintiffs mentioned that's in the Supplemental Extensive Record, actually talks at some length about the use of a habitat proxy and determines that the discussion that they point out in the footnote, they actually misread. What the report is trying to say there is, well, we need to keep doing these big demographic studies involving thousands of owls for the medium term. But there may come a day when our knowledge of the owl is so good that we can actually do away with those studies as well and just use habitat. That wasn't an endorsement of site-specific or project-specific surveys. It's really about how we're going to use the habitat proxy to determine whether or not the quality of the demographic data is really very good at this point, Your Honors. There is a feedback loop going on, so some of the statements in the record about trying to improve the quality of the information about the owl reflect the agencies constantly trying to improve the science and fine-tune the studies to make sure that we really know everything we can. So here, I have a question for you, then, Mr. Smith. If we were to follow inland, I think it's inland data, but inland data, and permit a habitat proxy for the survival of the species in assessing whether the jeopardy determination should be sustained, you're saying that the agency would be continuing, they would be following up with monitoring by survey. I mean, would there be jurisdiction for, I mean, could we say, in an opinion, that we approve it, but provided that the agency must do surveys in the next two or three or five years? Are you talking about the demographic studies that are going on right now? I mean, I think there's, the government is, those are long-term studies, and there's no plan to discontinue them, and I would assume that if those studies were to be continued, there would be jurisdiction to question the basis of the information being used to conserve the owl. In the review that we're making now, would it be permissible for us to say something about future surveys, or are we just limited in jurisdiction to saying affirmed or reversed? The Northwest Forest Plan itself contemplates the existence of these surveys, and certainly in upholding the Northwest Forest Plan, you're essentially approving the ongoing nature of these surveys. So there is some, there's certainly some scope to discuss that. If we approve that proxy use on the premise that these surveys would be ongoing, we could make it clear that if they were discontinued, or if they showed results that were contrary to what one would think the habitat proxy suggests, that the matter could be real. Your Honor, we ourselves believe that that's the nature of the Endangered Species Act. But that's not a new lawsuit, or a different one? That would be a different lawsuit. Well, I don't think you quite answered my question still. I mean, you've said that there's this combination of counting methods that's going on, but you haven't really pinpointed where the, in the short term, which was one of the issues that they've targeted, the habitat proxy has been scientifically validated, because there are a number of statements in the record that suggest, well, there's some problems, and we won't know until down the road, and that sort of thing. So what do you think is the best place for us to look to say that this is a reasonable scientific judgment? Well, the range-wide update, Your Honor, talks specifically about the use, the discontinuance of project-specific surveys and the reasons for discontinuing them, and then specifically talks about the use of these demographic studies and habitat data as a device for the use of habitat data, which is written in somewhat opaque scientific prose, but that's the general conclusion of the Lent report, is that the habitat proxy is valid, and that this combination of internally validated and cross-checked demographic studies is the right way to go in keeping track of the owl. Well, I'm the one person on the ground, and that's a Forest Service. I'm not on the ground, and I'm not a scientist, and all I can do, I guess, is to put the point in time on the lawsuit. The lawsuit says that your proxy is wrong. Science is wrong. Didn't do the right study. It doesn't represent showing that there's a survival or that there was enough recovery, okay? Now, it seems to me we analyzed what you did at the time of the lawsuit. I don't know what you're going to do tomorrow. You may have heat-seeking satellites. You're going to identify every owl by name and footprint. I don't know, but it seems to me I can't go beyond the science you give me to say, well, continue doing that. You may not want to do that, because there might be something better. So don't we analyze what you have done and record it in the biopsy and say, okay, we can go forward, because as I understand Inland, Inland says the science wasn't any good, so that the proxy wasn't any good. Am I right? Your Honor, the point of the Lent report is that these demographic studies are going to change, and they're going to be fine-tuned. That's right, but we can only look at what you did today as to this project and into that biop. We don't go into the biop and say, well, this is the future, so continue doing it. It might be the wrong thing to do in the future, because the scientists, as I understand, drive this. Your Honor, the Court is reviewing the record before the Court, and that's right, Your Honor. You either did it or you didn't do it. That's right, Your Honor. As to this project. Now, I don't know what's going to happen tomorrow. I mean, something's going to happen tomorrow. If I could turn quickly to some of the other, the plaintiffs characterized some other statements in the record as involving surveys, and actually the ongoing demographic studies. That's what the Lent report footnote is about. The statements in the range-wide update they point to actually are about fine-tuning the science on the late-successional reserves, and the surveys they want would be done in matrix. That's where the timber harvesting is, so it's really orthogonal to the problem that's going on, and the Fish and Wildlife Service is thinking about how best to scrutinize the late-successional reserves, and whether demographic surveys or some other kind of survey is the right methodology. There are a few other statements that, one of them involves a high-potential nesting habitat model, which is sort of a third-string model that's now been abandoned, where surveys might have been helpful, and some other points just involve scientists do always want more data. I thought I might turn quickly to the critical habitat issues. The recovery issue is not before this court, because both the Northwest Forest Plan and the critical habitat designation specifically envision the recovery of the species. That's the objective of both documents, and I think if you look at excerpts of record 121 and 397, that's the objective of both documents. You'll see some discussion of recovery. The modeling that was done, there was a rather complicated model of owl population dynamics that was done at the time of the adoption of the Northwest Forest Plan, and that modeling envisioned the recovery of the species after there would be a dip, and then the species would recover as the late-successional reserves got going. The biological opinions talk in terms of effects to these large blocks of habitat and connectivity, and I think that's the point. The biological opinions talk about effects to these large blocks of habitat and connectivity in the critical habitat discussion, and they also have a big discussion of jeopardy. It's really a continuum, Your Honors. That is, analyzing effects to these big blocks of habitat and connectivity affects both survival and recovery. It's a spectrum. It's a sliding scale. And it's the Fifth Circuit case. Am I missing something here? Do we recognize that, or is your argument overarching that? How do I tie that in? Well, Your Honor, the Fish and Wildlife Service isn't obliged to limit its analysis to survival, and in this case, because of the very controversial nature of the owl, it chose to design a program at both critical habitat and the LSR scheme, which envisions recovery. So it's really not presented. It's not before the court. The idea of these plans is for the species to recover, and that's what's being analyzed in these opposing counsel talks about a paragraph. It's actually a page or more, typically, and then there are tables in the appendices. The biological assessments provide a lot more data. I think if you look at page 549 and 616, you see a lot of background data on the CHUs, individual CHU by CHU. Before you get into your argument that you didn't need to analyze both, let's just step back a little bit and look at the regulation. What is your position on the regulation vis-a-vis the Fifth Circuit opinion? The United States continues to believe that the regulation is valid, but we're not pressing the issue of the regulation in this case, because it's really not presented here. Okay, well, let's just say it's not valid. Right. Okay. And that it's really an or, not a conflation of it's an or on survival or recovery. Given the regulation and that you are presumed to follow your own regulations, how does that overlay your argument that you're saying, well, we're only really dealing with recovery? You must look at the more specific, the specific controls to general. And here, the specific statements are the statements in the Northwest Forest Plan, which is an enormous document with an incredible amount of effort put into it. And in the critical habitat rulemaking, and again, I point you to pages 121 and 397 of the experts' record. Before you go there, answer my question. And the question is simply this. Don't get into the details of the Northwest Forest Plan. Is if the regulation is appropriately framed as survival or recovery, how does that overlap with the rules of the plan? What does that do to your analysis? Does it affect it? Does it not affect it? It doesn't affect it, because the specific controls to general and the specific statements here of what the Fish and Wildlife Service and the United States have been doing are that we're trying to promote the recovery of the species. That's what we're trying to do. So you're saying that even though when you look at sort of this critical habitat analysis, the fact that you don't use the word recovery is because it's implicit in the whole forest plan, which is the foundation? I mean, there are a lot of other issues and criteria in the regulations and in the statute, which we don't call out one by one. We don't discuss each type of take. Not everything is specifically called out in these biological opinions, but the framework is directed at recovery. It's unclear what the planists would envision would involve. I think what they envision is not doing timber harvesting. That seems to be the additional step that they would like. How about if they just envisioned that the agency would, in its written analysis of particular projects, would say, we've assessed habitat destruction, and the habitat destruction contemplated here is not a problem. We'll not jeopardize the continued existence of the species. We've further analyzed it, and it's not going to appreciably impair the species' chances for recovery. Because, okay, the forest plan's aimed at recovery, but the forest plan biological opinion also said, we're going to do these opinions on particular projects. They're going to have to be project specific. So why shouldn't we say, and maybe the end result is the same, but given the record before us, why shouldn't we say, the agency's regulation misstates the law required by the statute. The agency has shown that it was concerned about recovery in the national forest plan, but hasn't shown that it's addressed recovery, how habitat can affect recovery. On the acres at stake here, so we send it back and let the agency rewrite their stat, their regulation, or just address specifically recovery as well as existence of species. The biological opinion on the northwest forest plan does talk about a case-by-case analysis, but it also says that the goal is not to revisit the entire northwest forest plan framework, which implicitly includes recovery. The idea is instead to look at local dispersal problems and other things which affect both recovery and survival at the same time. Are you trying to tell us, and I think I asked counsel this question, I'm trying to sort through it myself, are you trying to say implicitly that your survival analysis includes an overarched recovery? In other words, we're not going to only have them survive, but whatever happens, they will recover. Well, I would even go further and say there's a single analysis of effects on the owl's, the grand structure of the owl's habitat and connectivity, and that single analysis goes both to survival and recovery. I know, and you're saying the plan says that. What counsel says, you haven't set it in a biop so that we can look at point A and point B. It's like vanilla and chocolate. You don't see the vanilla and chocolate here, according to counsel. Are you saying implicitly that because our overarching promise, our overarching duty, a goal in the plan is recovery? That when we look at the survival, whether it's, and it has to be biop by IOP, because you said we're going to look individual, that this biop will ensure recovery? That's absolutely right, and the focus of the demographic studies is on demographic models directed at achieving genetic interflow within the species that envisions a species that will come off of the Indian species. So therefore, biop per se is including survival? That's absolutely right, Your Honor. And then, does that mean that you look at the science, and as long as you pass the science test, then that will prove out, because if the science test doesn't work out, then your theory doesn't work out, right? That's right, Your Honor. I might also point out that industry sued us to seek the delisting of the owl, and that there's a report coming out shortly that addresses issues of whether the owl has recovered enough to be delisted. So it's really a big part of our scientific program is to look at the owl's recovery and whether it needs to still be on the list. I believe I should pass on the baton to my co-counsel. Pardon me? I'll be very short. James Walsh, representing the Intervenor. Let me go quickly first to the question of the Fifth Circuit decision. I think we have to look at the Fifth Circuit case facts. Number one, it was only critical habitat for the sturgeon. Second, it was only jeopardy. We don't have that in this case. We are looking at a plan. We're looking at forest sales in the context of a larger plan that has gone beyond where they were with sturgeon. Are you saying that because the Fifth Circuit case was looking at critical habitat for the sturgeon in the ocean, that here, because the Forest Service plan, as counsel's explained, looks to recovery, that we can't apply that, even though the Fifth Circuit said that the, as I remember what they said, was that this regulation was facially invalid? That's correct, Your Honor, but we don't have that factual pattern here. We have the same regulation. We have a regulation that either is or is not facially invalid. So just for talking purposes, we're going to ask you to assume that it's facially invalid. The question then becomes, does it matter? Well, my view is it doesn't matter because here we have facts that show that in the context of the northern spotted owl, it was both survival and recovery. We have that fact, and we have sufficient information in each of these biological opinions referring back to the context of the plan, because whenever you do a biological opinion, you pull in everything that's gone before, and everything that's cumulative, and everything that's related, and you make a decision. We are not at the same position. In my opinion, this case is really Greenpeace action versus Franklin. It's the same factual situation. I'm sorry. I didn't interrupt you. I'm sorry. Does that mean then in my analysis, and I'm trying to sort this out, if the biop does not support recovery, said or not said, then your theory falls apart? Because it sounds like if we analyze the facts that you said in each biop in each case, and it shows that there's a jeopardy analysis, and the survival is there, that the habitat issue is there, and that that also equals recovery, we're okay, even though you may not label it in big black letters. That's correct, Your Honor, because I think the facts will show that. Because we're not talking about just critical habitat. Remember, they have a huge number of other areas that are not critical habitat that were established for special protections. We're talking about those because we're looking at a population. We're not here in this study, in Section 7, we're talking about an incidental take. We're going to take some owls. That's authorized by the Endangered Species Act. What the concern is, will the taking of this particular habitat for these owls, which we know is absolutely necessary to the owl, result in jeopardy to the entire population and an inability to survive? I think the answer on the basic facts of this case is no. Well, I thought it wasn't an inability to survive. I thought you said it was also recovery. Recovery. It's recovery. Well, it makes a difference. Recovery of the population. It makes a difference. Well, survival could be survived in the state they were in when they were listed. I agree. But that's not the case. You can have four. My hypothetical, assume there were only four of these owls. You're going to have four owls for the next 200 years, but you never have more. But they did look at that. Otherwise, I mean, if you imagine the comprehensiveness of what the plan was done. I've never seen a plan, and I've done a lot of endangered species work, as comprehensive as this, other than maybe salmon. But maybe some information will come along later, but on this record, it's best available scientific information. What the plaintiff has to do is say, look at what they ignored, which is what Judge Zille said in the first instance that got this all started. Look at what they ignored. They ignored the biologist. Here, what the palanster is saying is, well, we quibble with them. We're not so sure that's really what they meant. Maybe there's some other information that's out there, but where are her scientists? If you've got a bureaucracy and a lot of fair-minded people looking at the law and deciding what to do, shouldn't we be concerned if they've got a regulation that we conclude misstates the requirements of the statute? But not if the action they have taken is not in violation of the statute, which is to consider both factors. So if the record shows they really, in the biological opinions, not just the National Forest Plan, I mean the Northwest Forest Plan, but in the separate opinions the six that issue here, if they considered recovery of the species, then they might be home free. It's harmless if the record says that. I think they're home free, because I think that's exactly what they did. And taking the owl off the endangered species, this has to impliedly say that that's recovery. They can't get off the list unless they recover. The way they do it is they have a recovery plan that's separate from all these other actions. There's a separate plan that you can find, but in the end, everything must track to recovery. There's a lot of stuff there, but if we went back to the forest plan, and if the plan wants to get the species off the endangered species, that's an overall arching goal here. And if the BiOp promotes that, then I take your argument to mean we are now looking at recovery, whether you label it that or not. That's correct. Now, there may be other information that changes that view, positive or negative, down the road, but on the basis of your record, which we're reviewing here, I think they've made that case. And what would be the harm in us saying that this is sort of a trick question from your side? I heard your other inquiry. What would be the harm in us saying the regulation has it wrong and the biological opinions on these six deals are ambiguous at best? They don't really address the issue. So go back and clarify what your analysis is on recovery as to these projects. Well, that would mean that you'd look at the record with a blinder and say, these bureaucrats have just followed their regulation and I'm going to presume they did, but I'm not going to look at the record and see whether it makes any difference. I think you need to look at the record and see whether it makes any difference because typically, you know, we've got a whole bunch of complex species out there and each one of them is a little bit different and I just don't see that there's a problem that has been created. Thank you. Thank you. We'll give you two minutes for rebuttal, although you went over the specific issue you need to address is So what if the regulation is wrong? The forest plan is predicated on recovery and that's what's basically throughout the BIOPS is a recovery mode. The regulation is wrong. The Northwest Forest Plan is directed at conservation of the owl and ultimate recovery. It is not a recovery plan. That's an important distinction under the Endangered Species Act. Secondly, the fact is we don't quibble with the scientists. The scientists themselves said that they needed to do this kind of population monitoring in the short term and they haven't done it. It's a relevant factor. They haven't analyzed it. They're not entitled to any deference. Most of the explanation that you're going to find is in Fish and Wildlife Service's brief and they're certainly not entitled to any deference to their litigation position. I would like to address the Inland Empire case to say that this court shouldn't follow an interpretation of the National Forest Management Act where this court held that they are specifically allowed under that statute to use habitat management to carry out its duties. This court should look more closely at the Arizona cattle growers case where the court was interpreting the Endangered Species Act and looking at distinctions between reliance upon habitat and reliance upon species. In that case, this court held that the Fish and Wildlife Service could not rely upon the fact that there was habitat within a grazing allotment in order to say that there would be a take of the species. The agency couldn't rely upon existence of habitat to say there would be a take of the species. They needed to have surveys in order to be able to say that. The same situation applies here. The agency can't rely upon habitat now at least because its own experts said that in the short term it was going to need this continued population monitoring. Moreover, in the follow-up case to Inland Empire, Idaho Sporting Congress v. Rittenhouse, the court very clearly said that you can't rely upon a habitat model. That's no good. What we have here in the record, and I'd like to point out at supplemental excerpt of record 310, the agency talks about the ultimate day when they will have a habitat model. They say phase one will culminate with model validation based upon data collected from outside the demographic study areas in selected validation sites. The agency isn't there yet, and these biological opinions don't undertake the analysis required by the Endangered Species Act. Thank you. Thanks to both counsel, both the argument as well as your very extensive briefing, which we've been buried under and have plowed through. So I think at this point, yeah, we'll take a short break. And the next case for argument is, let's see, the Assurance v. Wahl. If you'll come up and get yourself ready, we'd appreciate it. Thank you. All rise. The floor is now open. I'll tell you when you're ready. Thank you.
judges: Brunetti, McKeown, Gould